### UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF INDIANA
### FORT WAYNE DIVISION

| | |
|---|---|
| **MARVIN SLUSHER,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )　　**CAUSE NO. 1:05-CV-00237** |
| | ) |
| **JO ANNE B. BARNHART,** | ) |
| **Commissioner of Social Security,** | ) |
| | ) |
| **Defendant.** | ) |

### OPINION AND ORDER

Plaintiff Marvin Slusher appeals to the district court from a final decision of the Commissioner of Social Security ("Commissioner") denying Slusher's application under the Social Security Act (the "Act") for a period of disability and Disability Insurance Benefits ("DIB").[1] (*See* Docket # 4.)  For the reasons set forth herein, the Commissioner's decision will be REVERSED and the case will be REMANDED to the Commissioner for additional proceedings in accordance with this opinion.

### I.  PROCEDURAL HISTORY

Slusher applied for DIB on July 15, 2003, alleging that he became disabled as of May 24, 2003. (Tr. 38-40.)  The Commissioner denied his application initially and upon reconsideration, and Slusher requested an administrative hearing. (Tr. 19-20.)  On September 29, 2004, Administrative Law Judge (ALJ) Frederick McGrath conducted a hearing at which Slusher, who was represented by counsel, and a vocational expert testified. (Tr. 304-25.)  On March 2, 2005,

---

[1] All parties have consented to the Magistrate Judge. *See* 28 U.S.C. § 636(c).

the ALJ rendered an unfavorable decision to Slusher, concluding that he was not disabled because he could perform a significant number of jobs in the national economy despite the limitations caused by his impairments. (Tr. 13-18.)  The Appeals Council denied Slusher's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-12.)    Accordingly, Slusher filed a complaint with this Court on July 15, 2005, seeking relief from the Commissioner's final decision. (Docket # 2.)  This appeal became ripe for the Court's review as of March 16, 2006. (*See* Docket # 13-22.)

## II.  THE PARTIES' POSITIONS

Slusher points to two errors in the Commissioner's final decision.  First, Slusher claims that the ALJ erred in finding that Slusher's educational level was "limited," rather than illiterate, by neglecting to consider significant evidence and by failing to minimally articulate his reasoning for the determination. (Opening Br. of Pl. in Social Security Appeal Pursuant to L.R. 7.3 ("Opening Br.") at 16-20.)  Second, Slusher asserts that the ALJ improperly rejected the diagnosis of Mild Mental Retardation (MMR) assigned to him by Candace Martin, Psy.D., a psychologist who examined him at the request of the Commissioner.[2] (*Id*. at 20-22.)

The Commissioner, however, argues that substantial evidence supports the decision to deny Slusher a period of disability.  First, the Commissioner argues that the ALJ's assessment of Slusher's educational level was both reasonable and adequately articulated. (Mem. in Supp. of the Commissioner's Decision at 12-14.)  Second, the Commissioner contends that the ALJ

---

[2] Slusher also argues that his claim should be remanded under the sixth sentence of Section 405(g) of the Act because he has new evidence, a mental status evaluation performed by Sherwin Kepes, Ph.D., on March 22, 2005, that should be considered. (*Id*. at 22-25.)  However, because Slusher's first argument is ultimately successful (see Section V(B)(1) *infra*) and his claim will be remanded so that the Commissioner may properly determine Slusher's educational level, it will not be necessary to address his final argument.

reasonably assessed Slusher's mental functioning, properly discounting the MMR diagnosis assigned to Slusher by Dr. Martin because it was inconsistent with other evidence. (*Id.* at 14-15.)

## III. STANDARD OF REVIEW

Section 405(g) of the Act grants this Court "the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the case for a rehearing." 42 U.S.C. § 405(g).  The ALJ's decision must be sustained if it is supported by substantial evidence. *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000).

Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*  The decision will be reversed only if it is not supported by substantial evidence or if the ALJ applied an erroneous legal standard. *Id.*

Under this standard, the Court reviews the entire administrative record, but does not reweigh the evidence, resolve conflicts, decide questions of credibility, or substitute its judgment for the Commissioner's. *Id.*  Nonetheless, "substantial evidence" review should not be a simple rubber-stamp of the Commissioner's decision. *Id.*

## IV.  THE LAW

To be considered disabled under the Act, a claimant must establish that he is "[unable] to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to . . . last for a continuous period of not less than 12 months." 42 U.S.C. § 416(i)(1); 42 U.S.C. § 423(d)(1)(A).  The impairment must be severe, causing the claimant to be unable to do his previous work, or any other substantial gainful

3

activity which exists in the national economy. 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 405.1505-1511.

The Commissioner evaluates disability claims pursuant to a five-step evaluation process, requiring consideration of the following issues, in sequence: (1) whether the claimant is unemployed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals one of the impairments listed by the Commissioner, *see* 20 C.F.R. § 404, Subpt. P, App. 1; (4) whether the claimant is unable to perform his past work; and (5) whether the claimant is incapable of performing work in the national economy.[3] 20 C.F.R. § 404.1520; *see also Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).   An affirmative answer leads either to the next step or, on steps three and five, to a finding that the claimant is disabled. *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985).   A negative answer at any point other than step three stops the inquiry and leads to a finding that the claimant is not disabled. *Id.*   The burden of proof lies with the claimant on every step except the fifth, where it shifts to the Commissioner. *Clifford*, 227 F.3d at 868.

## V.  APPLICATION AND ANALYSIS

### A.  <u>The Facts</u>[4]

#### *1.  Background*

At the time of the hearing, Slusher was fifty-one years old, had a seventh grade

---

[3] Before performing steps four and five, the ALJ must determine the claimant's residual functional capacity ("RFC"), or what tasks the claimant can do despite his limitations. 20 C.F.R §§ 404.1520(e), 404.1545(a).  The RFC is then used during steps four and five to help determine what, if any, employment the claimant is capable of. 20 C.F.R. § 404.1520(e).

[4] The administrative record in this case is voluminous (325 pages), and the parties' disputes involve only small portions of it.  Therefore, in the interest of brevity, this opinion recounts only the portions of the record necessary to the decision.

education, and possessed twenty-eight years of work experience as a heavy equipment operator.[5]
(Tr. 38-43, 50, 54, 61, 76, 306-07, 313-14.)  Slusher left his job at Hanson Stone Quarry on April
24, 2003, after he "had 20 years in," because he was falling asleep while operating equipment on
the job. (Tr. 87, 308, 314.)  Slusher alleges he became disabled as of May 24, 2003, due to sleep
apnea, high blood pressure, diabetes, cardiac problems, and neck pain. (Tr. 46, 49.)

At the hearing, Slusher stated that he lives with his wife, but that he is home alone most
of the day when she is working. (Tr. 313.)  He reported that he is independent with self care and
spends his time watching television, preparing simple food, vacuuming, and watering his three
dogs and three horses. (Tr. 312, 317-18.)  He stated that although his physician has instructed
him not to drive because of his tendency to fall asleep, he does drive a car, but only for five to
eight minute trips. (Tr. 312, 316, 318.)  He explained that he has no hobbies, having to give up
deer hunting and "mess[ing] around with old tractors" because of his impairments, but does
socialize with his siblings who live nearby. (Tr. 312, 318.)

In contrast to his independence with self care, Slusher testified that he relies upon his
wife to perform most other household tasks, such as making grocery lists, writing checks,
managing the finances, and reading directions, because his reading is "not good," he can only do
"some" writing, and he is "[p]oor at math." (Tr. 64, 307, 317-18.)  For example, he stated that he
cannot follow written directions to prepare food from a recipe and cannot write checks, but can
make simple change. (Tr. 307-08.)  Slusher explained that his wife goes most places with him
and that she "[r]eads menus to him" and "[m]akes sure he gets proper change." (Tr. 64.)

Slusher participated in regular classes during his school years (rather than any special

---

[5] It is unclear whether Slusher actually completed the seventh grade, as the record in certain instances refers
to him having a seventh grade education and other times a sixth grade education. (Tr. 54, 307.)

education), but explained that in "[w]hat schooling he had, [he] did not pay attention." (Tr. 64, 316.)  He reported that "[h]e does not try to read" and "[i]f he had to take a test he would not understand what they want." (Tr. 64.)  He admitted that he cheated to obtain a driver's license by having a family member give him the answers and that his wife completed the DIB application for him. (Tr. 314-15.)  He also stated that in his twenty-eight years as a heavy equipment operator, he never had to take a test or obtain a license to keep his job and that learning his job did not require him to read. (Tr. 64, 316.)  Nonetheless, in contrast to his testimony depicting significant literacy limitations, Slusher answered "yes" to the following questions in the DIB application process: "Can you read English?" and "In [your] job, did you [d]o any writing, complete reports, or perform any duties like this?". (Tr. 49-50.)

From a physical capacity standpoint, Slusher, who was five feet eight inches tall and weighed 252 pounds at the time of the hearing, testified that he can stand for two-and-one-half hours at a time, sit for three hours uninterrupted, walk about 500 feet, and lift ten pounds. (Tr. 308, 310-12.)  He further reported that he has decreased strength in his right hand and can "hardly make a fist with it." (Tr. 268, 310-11.)

When asked at the hearing what medical problems prevent him from working, Slusher responded: "I've got sleeping trouble." (Tr. 308.)  He reported that he sleeps only two-and-one-half to three hours per night, but falls asleep approximately four to five times a day while watching television, sleeping for as long as an hour-and-a-half to two hours. (Tr. 309, 319.)  He stated that once he fell asleep while operating his riding mower and injured his hand, once he fell asleep in his deer stand, another time he fell asleep while driving his vehicle to work and woke up in someone's yard, and several times he fell asleep on the job. (Tr. 309, 312, 319.)  He stated

6

that he tried a continuous positive airway pressure (CPAP) machine to assist with sleeping, but gave it up because "it smothered [him] to have something on [his] face." (Tr. 308-09.)  He reported that at the time of the hearing, he had been suffering from sleeping problems for approximately one year. (Tr. 319.)

*2.  Relevant Medical History Summarized by Diagnosis*

A.  <u>Sleep Apnea</u>

On July 26, 2002, Slusher visited Dr. David Willyard, his family physician, to discuss sleeping medicine, stating that he was "having a lot of trouble sleeping." (Tr. 178.)  He explained that he frequently wakes up during the night and then is unable to go back to sleep. (Tr. 178.)  He also asserted that his sleeping trouble was impacting his job performance. (Tr. 178.)  Dr. Willyard prescribed Ambien to help establish his circadian rhythm. (Tr. 178.)

Nine months later, on March 26, 2003, Slusher again raised concerns to Dr. Willyard about his insomnia. (Tr. 171.)  In response, Dr. Willyard discontinued Slusher's Ambien and placed him on Sonata. (Tr. 171.)  A few weeks later, Slusher saw Dr. Willyard for a follow-up visit, reporting that he was still having problems with insomnia and that he thought the Sonota was not working very well. (Tr. 170.)

On April 23, 2003, Slusher visited Dr. Willyard, complaining again of sleeping problems. (Tr. 169.)  He reported that even if he got a good night's sleep, he still frequently falls asleep in his vehicle on the job. (Tr. 169.)  He stated that he produced a large amount of snoring and that his sleep was nonrestorative, but was unsure whether he had any episodes of apnea. (Tr. 169.)  Dr. Willyard concluded that Slusher had probable sleep apnea and possible obstructive sleep

7

apnea.[6] (Tr. 169.)  He instructed Slusher to drive only if someone was with him in the car, excused him from work, and referred him to Dr. David Stein, an ear, nose, and throat specialist. (Tr. 169.)  On May 7, 2003, Slusher returned to see Dr. Willyard, discussing a disability physical and still complaining of sleep problems. (Tr. 168.)

On May 29, 2003, Slusher underwent polysomnography, which indicated that Slusher had mild obstructive sleep apnea syndrome with severe associated oxygen desaturation. (Tr. 96.) Recommendations from the study included that a repeat polysomnography with CPAP titration be performed. (Tr. 96.)  On June 10, 2003, Slusher underwent the CPAP titration, which revealed that the application of nasal CPAP at a pressure level nine controlled his obstructive sleep apnea syndrome and his oxygen desaturation. (Tr. 93.)  It was recommended that Slusher use the CPAP machine at a pressure nine chronically for sleep to control his sleep apnea. (Tr. 93.)

On July 2, 2003, Slusher reported to Dr. Willyard that he had seen Dr. Stein, who diagnosed him with sleep apnea, but that he was unable to tolerate the CPAP machine despite trying several different masks. (Tr. 165.)  He also stated that he was going to have to quit his job, because his employer informed him it will not let him operate the heavy equipment due to his drowsiness. (Tr. 165.)  Dr. Willyard noted that Slusher was going to apply for DIB since he could not tolerate the CPAP machine and thus could not get his job back. (Tr. 165.)

However, in a letter dated July 21, 2003, Dr. Stein reviewed the diagnostic studies and treatment that Slusher had undergone. (Tr. 188-89.)  He summarized that Slusher had obstructive sleep apnea, failed CPAP, hypertrophic tonsils, and hypertrophic bilateral inferior turbinates.

---

[6] Sleep apnea is "caused by upper airway obstruction during sleep, associated with frequent awakening and often with daytime sleepiness." *Stedman's Medical Dictionary* 106 (William R. Hensyl, ed., 25th ed. 1990).

(Tr. 188.)  He further stated that he had recommended Slusher proceed with a tonsillectomy, uvulopalatopharyngoplasty, and bilateral submucosal resection of the inferior turbinates, but that Slusher had failed to comply with his recommendation. (Tr. 188.)  He opined that because Slusher "failed to comply with all treatment options," that "certainly . . . any limitations are temporary as opposed to permanent." (Tr. 189.)

B. <u>High Blood Pressure and Cardiac Problems</u>

On August 21, 2002, Slusher visited Dr. Willyard, complaining of headaches for the last ten days. (Tr. 177.)  Upon examination, his blood pressure was initially 210/122, but decreased to 180/120 after he rested for a few minutes. (Tr. 177.)

On June 28, 2002, Slusher was hospitalized for chest pain. (Tr. 121-25.)  A left heart catheterization was performed, which showed that the left anterior descending artery had moderate areas of thirty to forty percent narrowing; a third obtuse marginal branch of the circumflex was compromised by ninety-five percent; the distal circumflex was forty to fifty percent narrowed; and the right coronary artery was free of disease. (Tr. 124.)  He was assigned a diagnosis of single vessel coronary artery disease and underwent successful stenting of the third obtuse marginal. (Tr. 124-25.)

On July 26, 2002, Slusher visited Dr. Willyard for follow-up from his recent hospitalization for cardiac problems, reporting that his chest pain had totally resolved. (Tr. 178.)

On April 9, 2003, Dr. Willyard noted that Slusher's hypertension had been "kind of up and down." (Tr. 170.)

On May 19, 2003, Slusher was seen for a follow-up visit by Dr. William Collis, a cardiologist, who opined that Slusher was totally asymptomatic from a cardiac standpoint. (Tr.

180.)

However, on January 13, 2005, Slusher was admitted to Parkview Hospital due to chest pain and underwent a left heart catheterization. (Tr. 273-74.)  He underwent stent placement to the third obtuse marginal branch of the circumflex coronary artery. (Tr. 273.)  His discharge summary reported that he responded very well to the treatment. (Tr. 273.)

C.  Diabetes

On January 15, 2003, Slusher visited Dr. Willyard, complaining that he had been waking up at night sweating, feeling sick, and shaky, concerned because of his family history of diabetes. (Tr. 173.)  Slusher underwent diabetes testing, which apparently came back positive. (Tr. 173.)  On March 5, 2003, Slusher returned to Dr. Willyard, reporting high blood sugar even though he was taking Glucophage. (Tr. 172.)  On April 9, 2003, Dr. Willyard noted that Slusher's diabetes was "under pretty good control." (Tr. 170.)  On July 2, 2003, Dr. Willyard noted that Slusher was "doing ok" from a diabetes standpoint. (Tr. 165.)

On October 29, 2003, Slusher visited Dr. Willyard, complaining of pain and a burning sensation in his feet, which Dr. Willyard concluded was diabetic neuropathy. (Tr. 238.)  About a month later, Slusher returned to Dr. Willyard for a recheck of his ankle and feet, complaining of stiffness and pain in his right ankle. (Tr. 237.)  He explained that the pain was worse when he gets up in the morning, improved as the day went on, but resulted in soreness at the end of the day. (Tr. 237.)  He also still complained of burning in his feet, which Dr. Willyard again concluded was diabetic neuropathy. (Tr. 237.)  Upon examination, Slusher's right ankle did have some limitation in range of motion and minimal discomfort to palpation; however, motor, sensory, and vascular systems were intact to the distal digit tips. (Tr. 237.)  Dr. Willyard

10

prescribed Neurontin, which had previously alleviated Slusher's burning sensation. (Tr. 237.)

On February 2, 2004, Slusher returned to Dr. Willyard, complaining of excessive sweating in the last two weeks, which corresponded with when he began taking Neurontin. (Tr. 236.)  Upon examination, Dr. Willyard found that Slusher had no pretibial or ankle edema, noting that his neuropathy was well controlled with Neurontin. (Tr. 236.)  However, Dr. Willyard concluded that Slusher's excessive sweating might be an adverse reaction to the Neurontin; thus, he discontinued it. (Tr. 236.)

About two weeks later, Slusher again visited Dr. Willyard, requesting that he be placed back on Neurontin, because stopping it did not decrease his sweating and his pain and burning in his feet had increased. (Tr. 235.)  After examination, Dr. Willyard again prescribed Neurontin for Slusher. (Tr. 235.)

On March 31, 2004, Slusher returned to Dr. Willyard, complaining of right ankle pain and swelling. (Tr. 234.)  Dr. Willyard observed that Slusher's ankle had an area of ecchymosis, which was almost black, yet Slusher had experienced no trauma.[7] (Tr. 234.)  Slusher was able to ambulate, but his discomfort increased with standing; he had no pain upon sitting. (Tr. 234.)  Physical exam revealed a puncture-type wound to Slusher's right ankle, which Slusher stated he had been scratching open from time to time. (Tr. 234.)  Slusher's range of motion in his right ankle was very restricted due to pain, but the pain was minimal upon palpation to the area. (Tr. 234.)

On April 13, 2004, Slusher informed Dr. Willyard that he had experienced some blurring

---

[7] Ecchymosis is a "purplish patch caused by extravasation of blood into the skin." *Stedman's Medical Dictionary* 484 (William R. Hensyl, ed., 25th ed. 1990).

of his vision but that his optometrist concluded he did not need new glasses. (Tr. 233.)  Dr.

Willyard opined that Slusher's blurring vision was likely secondary to diabetes, even though it

was "under good control" based on his most recent test. (Tr. 233.)  Dr. Willyard referred him to

an ophthalmologist for a diabetic eye exam. (Tr. 233.)

### D.  Neck Pain and Arthritis

On September 18, 2002, Slusher visited Dr. Willyard, complaining of neck and cervical

pain, which had gotten progressively worse. (Tr. 176.)  On physical exam, Slusher had

restriction in range of motion of the cervical spine and had discomfort to palpation of the area.

(Tr. 176.)  Dr. Willyard prescribed Celebrex. (Tr. 176.)

On September 25, 2002, Slusher underwent an MRI of his cervical spine, which showed

straightening of the cervical spine possibly due to positioning or muscle spasm; mild cervical

spondylosis involving C3-4, C4-5, and C5-6 levels; mild narrowing of the left C4-5 neural

foramina; and a suggestion of small left C5-6 foraminal disc protrusion with minimal narrowing

of the left C5-6 neural foramina. (Tr. 90.)  A bone imaging spect of Slusher's cervical spine was

also performed, but was normal. (Tr. 103.)

On December 2 and 13, 2002, Slusher visited Dr. Willyard, complaining again of neck

pain. (Tr. 174-75.)  Slusher reported to Dr. Willyard that he had been examined by

neurosurgeons and was treated with nerve blocks, numerous anti-inflammatories, and physical

therapy, but that the treatment was not very successful in relieving his pain. (Tr. 174-75.)  He

further explained that when he is inactive, the pain is not very severe, but when he goes to work,

the pain increases. (Tr. 175.)  Dr. Willyard prescribed another anti-inflammatory and placed

Slusher on cervical exercises. (Tr. 174-75.)

On March 5, 2003, Dr. Willyard noted that Slusher was still suffering from chronic cervical pain, which was affecting his sleep, and prescribed a pain reliever to help alleviate his symptoms. (Tr. 172.)

On April 9, 2003, Dr. Willyard noted that Slusher was still having continued problems with chronic cervical pain and that he was experiencing a lot of jarring at work when he was operating heavy equipment. (Tr. 170.)

On October 29, 2003, Dr. Willyard noted that Slusher's arthritis was under "fairly good control." (Tr. 238.)

On July 19, 2004, Slusher visited Dr. Willyard, complaining of swelling and discomfort in his right hand, resulting in an inability to grasp items. (Tr. 232.)  While he also had some swelling in his left hand, it was less severe. (Tr. 232.)  Upon examination, Dr. Willyard noted that Slusher had decreased range of motion and grip strength in his right hand. (Tr. 232.)  Dr. Willyard suspected rheumatoid arthritis and ordered the drawing of a comprehensive arthritis panel. (Tr. 232.)

### 3.  Medical Source Opinions

#### A.  Disability Examination by Dr. Holton

On August 7, 2003, Slusher underwent a disability examination by Dr. Michael E. Holton. (Tr. 191-94.)  Slusher reported no anginal-type symptoms, but did complain of recurring neck pain. (Tr. 192.)  On physical examination, Dr. Holton noted that Slusher had normal gait and station without assistive devices and that he had no difficulty in walking on heels, toes, tandem walking, hopping, or squatting, except for slight intermittent favoring of his right ankle. (Tr. 192.)  While Dr. Holton noted some mild stiffness in Slusher's right ankle, no gross inability

13

or hypertrophic joint changes were observed. (Tr. 192.)  His neurological exam, muscular

strength, and muscle tone all were normal. (Tr. 192.)  Dr. Holton assigned the following

diagnoses: hypertensive cardiovascular disease, status post stenting, currently stable; recurring

neck pain; apparent post traumatic degenerative joint disease of the right ankle; non-insulin

dependent diabetes mellitus; history of sleep apnea; and a history of a learning disability. (Tr.

193.)

### B.  Functional Capacity Assessment by Dr. Whitley

On August 26, 2003, Dr. B. Whitley reviewed Slusher's medical record and opined that

he could lift fifty pounds occasionally and twenty-five pounds frequently, could stand and/or

walk for six hours in an eight-hour workday, and could sit six hours in an eight-hour workday.

(Tr. 195-203.)  Dr. Whitley assigned no postural, manipulative, visual, communicative, or

environmental limitations to Slusher. (Tr. 195-203.)  Dr. A. Lopez affirmed Dr. Whitley's

opinion on November 6, 2003. (Tr. 202.)

### C.  Psychological Examination by Candace Martin, Psy.D.

On August 29, 2003, Slusher underwent a psychological examination administered by

Candace Martin, Psy.D., at the request of the Commissioner. (Tr. 205-09.)  He reported to Dr.

Martin that he had never participated in counseling, had never been hospitalized for mental

health reasons, and did not have a history of substance abuse. (Tr. 205.)

Dr. Martin observed that Slusher had normal gait, erect posture, and that he displayed no

unusual motor behaviors. (Tr. 205.)  He was oriented to time and place, but did not know his

social security number. (Tr. 205.)  She found that he had marginal contact with reality, but that

he showed no specific evidence of a thought disorder. (Tr. 205-06.)  His vocabulary was below

14

average, but his speech was relevant, coherent, and normal for tone, volume, and articulation. (Tr. 206.) She observed that his thinking was concrete, as he was only able to provide limited information, and that he was a poor historian with respect to providing his personal history. (Tr. 206.) His mood appeared normal, with no evidence of emotional distress. (Tr. 206.) He displayed little spontaneous conversation, but was cooperative during the testing. (Tr. 206.) He exhibited somewhat marginal social skills and ability to establish rapport, but interacted appropriately and put forth a normal level of effort for the testing. (Tr. 206.) Dr. Martin noted that he appeared to try his best on all tasks, despite quickly saying that he did not know the answers to questions before even attempting them. (Tr. 206.)

After administering the WAIS-III, Dr. Martin opined that Slusher was functioning in the mildly mentally handicapped range of intelligence with a verbal IQ of sixty, a performance IQ of sixty-two, and a full scale IQ of fifty-seven. (Tr. 206.) She concluded that no significant cognitive strengths or weaknesses were indicated from the test results, determining that his working memory appeared to be an area of considerable weakness, while verbal comprehension, perceptual/organization skills, and processing speed were all found within the mildly mentally handicapped range. (Tr. 206.) Dr. Martin opined that Slusher's description of his adaptive functioning at home supports an MMR diagnosis, as Slusher is unable to do many chores (for example, shopping and managing personal finances) because he does not know the proper procedure to perform them. (Tr. 206.)

With respect to Slusher's work activities, Dr. Martin concluded that Slusher demonstrates very limited understanding of social concepts and that his memory skills are quite weak, reflective of his intellectual functioning. (Tr. 206.) Slusher was able to demonstrate an adequate

level of concentration and persistence when encouraged, but when performing tasks that require

him to perform at his frustrational level, he is likely to easily quit. (Tr. 206.)  He was able to

interact appropriately one-on-one, but his limited conceptual thinking limits his ability to

converse in extensive conversation. (Tr. 206.)  She concluded by assigning Slusher an MMR

diagnosis and opining that Slusher is likely able to work in a non-competitive situation that

provides him with extensive training, requires performance of only repetitive tasks, and does not

require considerable creativity or problem solving skills. (Tr. 206-07.)

### D.  Functional Capacity Assessment by K. Neville, Ph.D.

On October 5, 2003, K. Neville, Ph.D., reviewed Slusher's medical record and opined

that Slusher had mild limitation in activities of daily living and social functioning; moderate

limitation in maintaining concentration, persistence, and pace; and no episodes of

decompensation. (Tr. 210-31.)  He further concluded that Slusher's IQ and MMR diagnosis were

inconsistent with his extensive employment history and adaptive behavior, opining that he

retained the capacity to carry out simple, repetitive tasks in a competitive setting. (Tr. 211, 226.)

J. Pressner, Ph.D., affirmed Dr. Neville's opinion on October 7, 2003. (Tr. 226.)

### E.  Medical Source Statement by Dr. Willyard

On September 21, 2004, Dr. Willyard completed a Medical Source Statement on

Slusher's behalf, opining that Slusher could frequently lift and/or carry up to ten pounds; could

stand and/or walk for at least two hours in an eight-hour workday; could sit for less than six

hours in an eight-hour workday, alternating between sitting and standing to relieve discomfort;

could only occasionally climb, balance, kneel, crouch, crawl, stoop, reach, handle, finger, and

feel; and was prohibited from operating machinery. (Tr. 253-56.)  Dr. Willyard attributed

Slusher's exertional limitations to his sleep apnea and diabetes, his postural limitations to ankle pain and arthritis, his manipulative limitations to diabetes and arthritis, and his machinery prohibition to sleep apnea. (Tr. 253-56.)

*4. The ALJ's Decision*

On March 4, 2005, the ALJ rendered his opinion. (Tr. 13-18.)  He found at step one of the five-step analysis that Slusher had not engaged in substantial gainful activity, and at step two that he had severe impairments with respect to his arthritis, cardiac problems, and mental impairment. (Tr. 15-16.)  However, at step three, he determined that Slusher's impairments were not severe enough to meet a listing. (Tr. 16.)  Before proceeding to step four, the ALJ determined that Slusher had the following RFC:

> [T]he claimant is at least capable of simple, routine, repetitive, light unskilled work not involving production rates.  He can perform goal oriented work which would not involve climbing of ropes, ladders, and scaffolds and which would not expose him to heights or dangerous machinery.

(Tr. 16.)  Based on this RFC, the ALJ concluded at step four that Slusher could not perform his past relevant work as a heavy equipment operator and that he had no transferable skills. (Tr. 16.)  The ALJ proceeded to step five where he determined that, considering Slusher was approaching advanced age, had a "limited education" but was not illiterate, and had semi-skilled work experience, Slusher could perform a significant range of unskilled, light work available in the national economy, including hospital cleaner, café attendant, and delivery driver. (Tr. 16-17.)  Therefore, Slusher's claim for DIB was denied. (Tr. 17-18.)

17

### B.  **The Analysis**

#### 1.  *The ALJ's Determination That Slusher Has a "Limited Education" Is Not Supported By Substantial Evidence*

Slusher first claims that the ALJ erred in finding that Slusher's educational level was "limited," rather than "illiterate," by neglecting to consider significant evidence and by failing to minimally articulate his reasoning for the determination.  He explains that this purported error by the ALJ is significant because if he was considered illiterate, he would have been presumed disabled as of his fiftieth birthday under the grid rules. (Opening Br. at 19-20); *see* 20 C.F.R. § 404, Subpt. P, App. 2.  Ultimately, Slusher is correct that the ALJ's determination of his educational level is not supported by substantial evidence; however, the record does not contain sufficient evidence to conclude that he is illiterate either, and thus his claim must be remanded to properly determine his educational level.

The relevant regulation with respect to determining a claimant's educational level provides:

> (a) General.  Education is primarily used to mean formal schooling or other training which contributes to your ability to meet vocational requirements, for example, reasoning ability, communication skills, and arithmetical ability. . . . Past work experiences and the kinds of responsibilities you had when you were working may show that you have intellectual abilities, although you may have little formal education.  Your daily activities, hobbies, or the results of testing may also show that you have significant intellectual ability that can be used for work.

> (b) How we evaluate your education.  The importance of your educational background may depend upon how much time has passed between the completion of your formal education and the beginning of your physical or mental impairment(s) and by what you have done with your education in a work or other setting.  Formal education that you completed many years before your impairment began, or unused skills and knowledge that were a part of your formal education, may no longer be useful or meaningful in terms of your ability to work. Therefore, the numerical grade level that you completed in school may not

18

represent your actual educational abilities.  These may be higher or lower.
However, if there is no other evidence to contradict it, we will use your numerical
grade level to determine your educational abilities. . . . In evaluating your
educational level, we use the following categories:

> (1)  Illiteracy.  Illiteracy means the inability to read or write.  We
> consider someone illiterate if the person cannot read or write a simple
> message such as instructions or inventory lists even though the person can
> sign his or her name. Generally, an illiterate person has had little or no
> formal schooling.

> (2) Marginal education.  Marginal education means ability in
> reasoning, arithmetic, and language skills which are needed to do simple,
> unskilled types of jobs.  We generally consider that formal schooling at a
> 6th grade level or less is a marginal education.

> (3) Limited education.  Limited education means ability in
> reasoning, arithmetic, and language skills, but not enough to allow a
> person with these educational qualifications to do most of the more
> complex job duties needed in semi-skilled or skilled jobs.  We generally
> consider that a 7th grade through the 11th grade level of formal education
> is a limited education. . . .

20 C.F.R. § 404.1564.

Here, the ALJ considered several pieces of evidence pertaining to Slusher's educational

limitations.  He considered Slusher's assertions that he cheated to get his driver's license and

that his wife has to do his reading for him, which cut against a determination of a "limited

education" and more in favor of a finding of illiteracy. (Tr. 15.)  On the other hand, the ALJ also

considered that Slusher had a seventh grade formal education, that he attended regular classroom

education rather than any special education, that he answered "yes" to the question whether he

did any "writing, complete[d] reports, or perform[ed] any duties like this" in his job, that he was

successfully employed as a heavy equipment operator for more than twenty-five years, and that

his employer noted no mental deficiencies on the job. (Tr. 13, 15-16.)  After weighing the

evidence, which he acknowledged was "somewhat contradictory," (Tr. 15), the ALJ concluded

that Slusher had a "limited education" and was not illiterate. (Tr. 16.)

Slusher argues, however, that the ALJ's finding is not supported by substantial evidence, contending that the ALJ selected primarily the evidence that supported his conclusion and ignored significant evidence that favors a finding of illiteracy. (Opening Br. at 18.)  Specifically, Slusher points to his testimony that he cannot write a grocery list, cannot follow directions to cook, cannot write a check, and has a limited ability to make change, and his statements during the DIB application process that he is poor in math, that if he had to take a test he would not understand it, and that "[l]earning his job did not require him to read." (Tr. 64, 307.)

Slusher further argues that some of the evidence relied upon by the ALJ – that his employer noted no mental deficits on the job and that he did not attend special education classes – does not build an accurate and logical bridge to the ALJ's literacy determination, because "the document completed by the employer [did] not ask specifically about his abilities to read and write" and "[t]he absence of special education does not necessarily lead to the conclusion that he is not illiterate as the school may not have had special education or if it did, his problem may not have been identified as one appropriate for special education classes." (Opening Br. at 19.) Slusher also asserts that the ALJ's reliance on his representation in the DIB application process that in his job he did "writing, complete[d] reports, or perform[ed] any duties like this," is misplaced, as he asserts that this question is too vague to be useful without follow-up questioning, contending that he may merely have had to check familiar boxes on a form or sign his name on a report. (Opening Br. at 18-19.)

Slusher's arguments are persuasive, as the ALJ's determination that Slusher has a "limited education" is not supported by substantial evidence.  While indeed the ALJ was not

20

required to "provide a written evaluation of every piece of evidence that is presented," *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004), here he demonstrated an ostrich-like attitude, turning a blind eye to a significant amount of contradictory evidence and the record as a whole. *See Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (emphasizing that an ALJ must not ignore evidence which contradicts his opinion, but must evaluate the record fairly); *Brindisi ex rel. Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (commenting that when the ALJ fails to mention key evidence in his opinion, the court is left to wonder whether such evidence was even considered); *Herron v. Shalala*, 19 F.3d 329, 333 (7th Cir. 1994).

First, Slusher has, at best, a seventh grade formal education; a "limited education" is generally characterized by formal education between the seventh and eleventh grades. *See* 20 C.F.R. § 404.1564(b)(3).  While that fact alone is not determinative, *see* 20 C.F.R. § 404.1564(b), the evidence in Slusher's testimony and DIB application that contradicts a seventh grade literacy level is:

> Q      Are you able to read?
> A      Not good.
>
> . . . .
>
> Q      Can you understand what you read?
> A      Not really, no.
>
> Q      Are you able to write?
> A      Yes, some.
>
> Q      Are you able to write well enough to, say, make a grocery list?
> A      No.
>
> Q      Are you able to read and follow directions such as on a box where you have to . . . cook something?
> A      No.

Q        Do you handle your own finances, like writing checks - -
A        No.


Q        - - and stuff like that?
A        I can't write a check?


Q        Are you able to make change?
A        Just certain things I can.  If it's like change or something like that I can.


. . . .


Q        When you got your driver's license did somebody have to read that test to
         you or did you have any special accommodations?
A        My sister told me the answers.


Q        Who filled out the [DIB] form?
A        My wife.


. . . .


Q        How about cooking, [do you do] any cooking?
A        I just fry an egg or something like that.  As far as reading anything to - - I
         can't do it.

(Tr. 307-08, 314-15, 318.)  Clearly, the ALJ ignored significant evidence, both in Slusher's

testimony and in the DIB application process, that indicated Slusher's educational level falls far

from the mark of the "limited education" level described in the regulations, perhaps instead more

closely falling within the illiteracy category.[8] 20 C.F.R. § 404.1564(b)(1) (stating that an

_____

[8] The ALJ generally found Slusher not credible, stating that his "subjective complaints lack a reasonable
medical basis and are not credible." (Tr. 16.)  To the extent that the ALJ's credibility determination is intended to
apply to Slusher's statements about his literacy level, however, the ALJ's reasoning behind the determination is
"patently wrong." *See Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000).
         First, Dr. Martin's diagnosis of Slusher as MMR, to be discussed *infra*, *does* provide a medical basis for the
educational limitations that Slusher testified to.  Second, and more importantly, the determination of Slusher's
educational level is not a medical issue; rather, it is a vocational factor considered at the fifth step of the sequential
analysis where "the burden shifts to the Commissioner to demonstrate that the claimant can perform other work in
the national economy." *Butera v. Apfel*, 173 F.3d 1049, 1054 (7th Cir. 1999).  Apart from his discrediting of Slusher
due to a "lack of a reasonable medical basis," the ALJ pointed to Slusher's lengthy work history, that his employer
noted no cognitive deficits on the job, and that he earned over $55,000 per year as a heavy equipment operator as a
means to discredit his statements about his literacy limitations.  However, these reasons fail to "build an accurate and
logical bridge between the evidence and the result," because, as will be discussed *infra*, Slusher's literacy cannot be
reasonably inferred from this evidence. *Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000); *see generally Herron*,

individual is considered illiterate if he "cannot read or write a simple message such as instructions or inventory lists even though the person can sign his or her name").

Moreover, the ALJ's reliance upon Slusher's lack of special education, his lengthy employment as a heavy equipment operator, and that his employer noted no mental deficits on the job falls short of building an accurate and logical bridge to the conclusion that Slusher has a "limited education" and is not illiterate. *See Scott v. Barnhart*, 297 F.3d 589, 595 (7th Cir. 2002). Whether or not Slusher attended special education classes is not a reasonable indicator of his literacy level, as special education may not have even been available at his school, and furthermore he admitted in "[w]hat schooling he had [he] did not pay attention." (Tr. 64); *see generally Boone v. Sec'y of Health & Human Servs.*, 595 F. Supp. 758, 759-60 (D.C. Mich. 1984) (finding a claimant with a seventh grade formal education illiterate, emphasizing that "a claimant's grade level completion is not conclusive evidence of his educational abilities").  As to his lengthy history of successful employment, Slusher stated in the application process that "[l]earning his job did not require him to read," later testifying that he never had to take a test to keep his job. *See Cole v. Apfel*, No. 98 C 6735, 2000 WL 290432, at *4 (N.D. Ill. March 17, 2000) (declining to infer a claimant's literacy from his past work as a construction worker, since the job likely required little, if any, reading or writing ability).  If Slusher's job did not require reading or writing, his employer would likely be unaware of Slusher's deficiencies, as "common sense suggests that [Slusher] would not readily volunteer the fact that he is illiterate unless

---

19 F.3d at 336 (rejecting several of the ALJ's reasons for discrediting the claimant because "the ALJ based his finding on an incorrect inference"); *Wates v. Barnhart*, 274 F. Supp. 2d 1024, 1040 n.9 (E.D. Wis. 2003) ("[T]he ALJ should not have drawn an adverse inference with respect to [a claimant's] credibility without making additional inquiry under SSR 96-7p."); *Lee v. Barnhart*, No. 01 C 2776, 2003 WL 260682, at *8 (N.D. Ill. Feb. 6, 2003) (emphasizing that when assessing a claimant's credibility, an ALJ must seek available information in accordance with SSR 96-7p "[r]ather than relying on negative inferences").

23

compelled to do so." *Cunningham v. Shalala*, 880 F. Supp. 537, 554 (N.D. Ill. 1995).

Likewise, the ALJ's significant reliance upon Slusher's representation in the DIB application process that in his job he did "writing, complete[d] reports, or perform[ed] any duties like this," is unwarranted in the face of significant evidence in his testimony and DIB application that indicated otherwise. *See Cunningham*, 880 F. Supp. at 554 (finding that while claimant's job included tasks such as checking reports for certain numerical values, it was far from clear that these tasks required "reading" in any meaningful sense); *see also Eggleston v. Bowen*, 851 F.2d 1244, 1248 (10th Cir. 1988) (reversing finding of literacy where ALJ solely relied upon an inference derived from the claimant's work history to support his conclusion that claimant was literate, and the inference of literacy was rebutted by claimant's testimony); *see generally Glenn v. Sec'y of Health & Human Servs.*, 814 F.2d 387, 389-90 (7th Cir. 1987) ("The regulations make clear that being able to sign your name doesn't make you literate and that you can be illiterate even if you have had a significant amount of formal schooling (it may not have taken).").

Thus, the ALJ's determination that Slusher has a "limited education" is not supported by substantial evidence, as significant evidence contradicts any inference arising from Slusher's formal seventh grade education. *See* 20 C.F.R. § 404.1564(b) ("[I]f there is *no other evidence to contradict it*, we will use your numerical grade level to determine your educational abilities.") (emphasis added); *Cole*, 2000 WL 290432 at *5. Likewise, we do not find substantial evidence to conclude that Slusher is illiterate; rather, the record simply is lacking in evidence to support any definitive classification of Slusher's educational level. *Cole*, 2000 WL 290432 at *4 (emphasizing that in order to make a meaningful determination of literacy, it would have been

helpful if the ALJ knew what specific words the claimant could read or if the claimant had demonstrated his reading/writing ability to the ALJ); *see also Glenn*, 814 F.2d at 390-91 (concluding that claimant was literate *when he demonstrated to the ALJ at the hearing* that he could comprehend simple instructions and write simple messages).  At a minimum, the ALJ was required to further explore the question of Slusher's literacy. *See Wolfe v. Chater*, 86 F.3d 1072, 1077 (11th Cir. 1996) (remanding case to determine further findings of fact with respect to claimant's educational level after concluding that the ALJ's determination that claimant had a "marginal education" was not supported by substantial evidence).

Therefore, this case must be remanded in order that Slusher's educational level be properly determined. *See generally Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004) (emphasizing that a court may not "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner," rather its "task is limited to determining whether the ALJ's factual findings are supported by substantial evidence").

### 2.  The ALJ Erred By Rejecting the Opinion of Dr. Martin, an Examining Psychologist

Next, Slusher asserts that the ALJ erred by failing to give proper credence to the opinion of Candace Martin, Psy.D., who examined Slusher and assigned him an MMR diagnosis.[9]

_____

[9] The following is useful background information on MMR,:

The essential feature of Mental Retardation is significantly subavarage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B).  The onset must occur before age 18 years (Criterion C). . . .

. . . .

Impairments in adaptive functioning, rather than a low IQ, are usually the presenting

Again, Slusher's argument is convincing, as the ALJ's decision to discount Dr. Martin's opinion is not supported by substantial evidence.

The Commissioner must "evaluate every medical opinion [it] receive[s]." 20 C.F.R. § 404.1527(d).  Each medical opinion, other than a treating physician's opinion entitled to controlling weight, must be evaluated pursuant to factors set forth in 20 C.F.R. § 404.1527(d) to determine the proper weight to apply to it.[10] *See* 20 C.F.R. § 404.1527(d); SSR 96-2p; *see generally White v. Barnhart*, 415 F.3d 654, 658-60 (7th Cir. 2005).  Specifically, "[a]n ALJ can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003); *see also Young*, 362 F.3d at 1001-02;

---

symptoms in individuals with Mental Retardation.  *Adaptive functioning* refers to how effectively individuals cope with common life demands and how well they meet the standards of personal independence expected of someone in their particular age group, sociocultural background, and community setting.  Adaptive functioning may be influenced by various factors, including education, motivation, personality characteristics, social and vocational opportunities, and the mental disorders and general medical conditions that may coexist with Mental Retardation. . . .
. . . .
Mild Mental Retardation is roughly equivalent to what used to be referred to as the educational category of "educable." . . .  As a group, people with this level of Mental Retardation typically develop social and communication skills during the preschool years (ages 0-5 years), have minimal impairment in sensorimotor areas, and often are not distinguishable from children without Mental Retardation until a later age.  By their late teens, they can acquire academic skills up to approximately the sixth-grade level.  During their adult years, they usually achieve social and vocational skills adequate for minimum self-support, but may need supervision, guidance, and assistance, especially when under unusual social or economic stress.  With appropriate supports, individuals with Mild Mental Retardation can usually live successfully in the community, either independently or in supervised settings.

American Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 42-43 (4th ed. 2000).

[10] The Commissioner must apply the following factors to determine the proper weight to give a medical opinion: (1) the length of the treatment relationship and frequency of examination; (2) the nature and extent of the treatment relationship; (3) how much supporting evidence is provided; (4) the consistency between the opinion and the record as a whole; (5) whether the treating physician is a specialist; and (6) any other factors brought to the attention of the Commissioner. 20 C.F.R. § 404.1527(d); *see also Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996).

*Windus v. Barnhart*, 345 F. Supp. 2d 928, 945 (E.D. Wis. 2004).

Here, the ALJ considered Dr. Martin's opinion but ultimately assigned it little weight, stating that Slusher's MMR diagnosis was "clearly inconsistent" with his adaptive behavior and his lengthy semi-skilled work history, including his "stable employment for almost twenty years with an employer who noted no mental problems at all and reported earnings of $55,000.00 per year." (Tr. 15-16.)  The ALJ also found it significant that Slusher had no history of mental diagnosis or treatment prior to Dr. Martin's opinion, nor any educational records pointing to an MMR diagnosis. (Tr. 15.)  Ultimately, the ALJ opted to side with the opinion of K. Neville, Ph.D., the reviewing state agency psychologist who opined that Slusher's IQ and MMR diagnosis were inconsistent with Slusher's adaptive behavior and lengthy work history.

Slusher, however, argues that the ALJ erred by rejecting the opinion of Dr. Martin in favor of the opinion of a state agency psychologist who merely reviewed his record. (Opening Br. at 20-21.)  Slusher's argument is persuasive, as a contradictory opinion of a non-examining physician by itself is insufficient to defeat an examining physician's opinion. *See Gudgel*, 345 F.3d at 470; *Windus*, 345 F. Supp. at 945.  The ALJ's attempt to bolster the state agency physician's opinion by pointing to Slusher's lengthy work history, his adaptive behavior, the lack of any prior mental health diagnosis and treatment, and the lack of any educational records supporting an MMR diagnosis fails to save the day, as such evidence is not necessarily inconsistent with Dr. Martin's opinion and appears to merely be an attempt by the ALJ to "play doctor" through indulging in his own lay view of MMR. *See Rohan v. Chater*, 98 F.3d 966, 971 (7th Cir. 1996) (holding that the ALJ was impermissibly "playing doctor" when he concluded that the claimant's effort to engage in a small business was incompatible with a diagnosis of

27

depression); *Wilder v. Chater*, 64 F.3d 335, 337-38 (7th Cir. 1995) (reversing ALJ's decision where ALJ determined that claimant's work as an armed security guard was simply incompatible with the diagnosis of depression assigned by the psychiatrist).

Specifically, Dr. Martin opined that Slusher's adaptive behavior *is* reflective of an MMR diagnosis, explaining that he is unable to complete many basic tasks at home without his wife's direction. Likewise, Slusher's past work as a heavy equipment operator perhaps may not fall far from the "non-competitive situation that does not require considerable creativity or problem-solving skills and does provide him with extensive training and only repetitive tasks to pursue" that Dr. Martin opined Slusher would likely be successful in; thus, his lengthy work history, which Dr. Martin specifically took note of, is not necessarily inconsistent with her diagnosis. Furthermore, in the context of MMR, rejecting the results of Dr. Martin's objective testing merely because it is the first mental status examination that Slusher has undergone is illogical. *See Guzman v. Bowen*, 801 F.2d 273, 275 (7th Cir. 1986) (articulating that mental retardation is a lifelong condition and that an IQ test can be used to infer mental retardation in the past); *Blackwell v. Barnhart*, 258 F. Supp. 2d 851, 863-64 (N.D. Ill. 2003).

After stripping away the ALJ's attempt to "play doctor," the ALJ relied merely upon a reviewing state agency physician's opinion when he rejected Dr. Martin's opinion. This is clearly insufficient, *see Gudgel*, 345 F.3d at 470; *Windus*, 345 F. Supp. at 945, and thus the ALJ's decision to reject Dr. Martin's opinion is not supported by substantial evidence.

## VI.  CONCLUSION

As discussed herein, the ALJ's determination that Slusher has a "limited education" is not supported by substantial evidence, and the ALJ further erred by rejecting the opinion of Dr.

Martin, an examining psychologist, who assigned Slusher an MMR diagnosis.  Accordingly, the decision of the Commissioner is REVERSED and the case is REMANDED to the Commissioner for further proceedings in accordance with this opinion.  The Clerk is directed to enter a judgment in favor of Slusher and against the Commissioner.  SO ORDERED.

Enter for this 12th day of April, 2006.

S/Roger B. Cosbey
Roger B. Cosbey,
United States Magistrate Judge